# CASES DETERMINED

## BY THE

# SUPREME COURT

### OF THE

## STATE OF MISSOURI

### APRIL TERM, 1915.

---

THE STATE ex inf. JOHN T. BARKER, Attorney-General, v. ARMOUR PACKING COMPANY, MORRIS & COMPANY and SWIFT & COMPANY.

THE STATE ex inf. JOHN T. BARKER, Attorney-General, v. HAMMOND PACKING COMPANY and ST. LOUIS DRESSED BEEF & PROVISION COMPANY.

### In Banc, May 3, 1915.

1. **QUO WARRANTO: Information: Sufficiency: In Language of Statute.** In a *quo warranto* brought against corporations charged with having entered into a combination in restraint of trade, the statute (Sec. 10310, R. S. 1909) dispenses with the necessity of specific allegations in the petition, either as to the time, the manner or the place the trust was effected; and such statute is applicable both to cases wherein the offenses committed were wrong in themselves, and those in which a lawful right has been misused.

    *Held*, by WOODSON, C. J., concurring, that the Legislature has the same power to control pleadings and procedure in the Supreme Court that it has to control those of the circuit court, and it is wholly immaterial whether the case be a

265 Mo.]          (121)

State ex inf. v. Armour Packing Co.

proceeding in *quo warranto* brought by the Attorney-General *ex officio* in the Supreme Court to oust corporations of their franchises, or a proceeding for other original writs intrusted to the keeping of the Supreme Court.

*Held*, by BOND, J., dissenting, that the Supreme Court, in the exercise of its jurisdiction conferred upon it by the Constitution to issue an original writ in *quo warranto* upon the information of the Attorney-General *ex officio*, acts in virtue of the jurisdiction as conferred, and that jurisdiction cannot be regulated by the Legislature any further than the court sees fit to adopt such regulation as a reasonable rule of procedure; and that the statute (Sec. 10310, R. S. 1909) declaring it shall be unnecessary to "allege or plead the manner in which, or when or where" a combination in restraint of trade "was made or effected," cannot be held to be decisive of the sufficiency of the information in such case.

2. ———: ———: **Sufficient Specification.** An information charging that defendant corporations entered into a pool, trust and combination among themselves and with other corporations to regulate, fix and control prices of certain products for sale and to be sold in this State; to maintain such prices when so regulated and fixed; to regulate, fix and limit the quantity of such commodities sold and to be offered for sale in this State, etc., is sufficient in its specification of facts showing a violation of the anti-trust statutes, even though the statute making it unnecessary to plead the time, manner and place of such combination be disregarded.

*Held*, by WOODSON, C. J., concurring, that where the information in a *quo warranto* charges that the conspiracy in restraint of trade was formed by defendants for an unlawful purpose, it is unnecessary to state the facts constituting the conspiracy; but where the conspiracy was formed for the purpose of doing a lawful act in an unlawful way then the facts constituting the conspiracy should be pleaded.

*Held*, by BOND, J., dissenting, that an information in *quo warranto* brought by the Attorney-General to oust corporations of their franchises for that they have entered into a combination in restraint of trade in violation of the anti-trust statutes, is insufficient unless it definitely and specifically states the facts and circumstances showing guilt under those statutes.

3. ———: ———: ———: **Answering Over: Waiver.** Answering over by the defendants charged with having entered into a combination in restraint of trade is equivalent to a waiver of objection to the general allegations and lack of specification of facts of the information; and demurrers incorporated in the

return or answer, do not call for a ruling thereon, but place defendant in the attitude of having answered over.

*Held,* by BOND, J., dissenting, that an information which charges in general terms a violation of the statute, in the language of the statute, without any specification of the facts which constitute its violation, does not state a cause of action, and is not an imperfect statement of a cause of action, and hence the objection that it totally failŝ to state a cause of action is open to respondents at all times, with or without demurrer.

4. ———: ———: **Unnecessary Allegations.** If the information in *quo warranto* sets forth sufficient facts to constitute a cause of action against the defendant corporations, plaintiff's right of redress is not to be prejudiced by the facts that unnecessary statements are added, but they will be regarded as surplusage.

5. ———: ———: **General Rules of Pleading.** An information in a *quo warranto* against corporations charged with having entered into combination in restraint of trade, is to be governed by the general rules of civil procedure. [BOND, J., dissenting.]

6. ———: ———: **Sufficiency of Evidence.** The evidence in this case is clear and convincing that three powerful packing companies entered into a combination in restraint of trade, by organizing another company in New Jersey, with a capital stock of fifteen million dollars, organized ostensibly as a packing company, but in fact as a holding company, whose capital stock consisted of eighty per cent of the stock of. the three companies and the properties of other competing companies, bought with money borrowed on these properties as security, and, by using said company as their instrumentality, perfected a plan, between themselves and such other subsidiary companies, that resulted in a common management, a community of stock interest, an arbitrary fixing of the purchasing and selling prices of live stock and the dressed products thereof, and the restriction of the quantity of live stock to be bought or sold, all of which resulted in the destruction or lessening of competition in this State between them and the other corporations whose stock were acquired by said New Jersey company.

7. ———: ———: **Lawful Elements: Combined Into Unlawful Scheme.** Although the separate elements of a scheme may be lawful, if bound together by a common intent as parts of an unlawful scheme to effect a monopoly, the plan will make the parts unlawful. The combination in restraint of trade is not rendered lawful, or its unlawful character affected, by the fact that the articles of association of the holding corporation organized by defendants bore on their face evidence that it was an organization for a lawful purpose, if it was in fact one of the

State ex inf. v. Armour Packing Co.

instrumentalities used by them to carry out the unlawful combination and agreements to prevent competition, restrict the quantity of products and fix their prices.

8. ———: ———: **Limitations.** A *quo warranto* against corporations for penalties and forfeiture is not barred by limitations if brought within three years after the unlawful combination in restraint of trade was formed.

9. ———: ———: **Misjoinder of Defendants.** It is not a misjoinder of defendants to join in one action of *quo warranto* all corporations, domestic and foreign, licensed to do business in this State, which have misused and abused their franchises by entering into a combination in restraint of trade. If guilty, there is but one satisfaction: a forfeiture of the domestic corporations' franchises, and the revocation of the foreign companies' licenses, and in addition the assessment of appropriate penalties. The rules of civil procedure as to joining of causes of action and of defendants apply, though each respondent has a separate contract with the State.

10. ———: ———: **Repeal of Statutes.** The Act of 1913 (Laws 1913, pp. 549-555) did not repeal the existing anti-trust statutes, but simply made additions to the acts declared in those statutes to be necessary to constitute an unlawful combination in restraint of trade.

11. ———: ———: **Res Adjudicata.** A defense of former acquittal or prior adjudication, in either a criminal or civil proceeding, to be available, must be pleaded.

12. ———: ———: **Statutes Constitutional.** The anti-trust statutes of Missouri violate neither the Federal nor State Constitution.

*Quo Warranto.*

For JUDGMENT SEE *post*, PAGE 151.

*John T. Barker,* Attorney-General, and *Ernest A. Green,* Assistant Attorney-General, for relator; *Frank H. Farris* of counsel.

(1) The information in this cause is sufficient and specifically charges facts which show, if true, that respondents have violated the antitrust statutes of this State. There is no misjoinder of parties respondent. State ex inf. v. Railroad, 240 Mo. 35; State ex rel. v.

Grimm, 220 Mo. 483; State ex inf. v. Standard Oil Co., 218 Mo. 1; Sec. 10310, R. S. 1909. (2) This action is not barred by the Statutes of Limitation. In this State we have no Statute of Limitations against the State instituting suits by the Attorney-General by information, in the nature of *quo warranto,* such as the suit at bar. Besides, at the time of filing this information respondents were still members of and participating in the unlawful pool and combination. High on Extraordinary Legal Remedies (3 Ed.), sec. 621; State ex rel. v. Westport, 116 Mo. 595; State ex rel. v. Huff, 105 Mo. App. 634; State ex rel. v. Vandalia, 119 Mo. App. 424; Commonwealth v. Birchett, 2 Va. Cas. 51; State ex rel. v. Turnpike Co., 8 R. I. 521. (3) The commissioner who heard the testimony and had the witnesses before him reports that from the evidence adduced the National Packing Company was organized for the express purpose of limiting and destroying free competition, and that respondents have been and are maintained by the National Packing Company solely in furtherance of that unlawful purpose. Unless the findings of a commissioner appointed by the court to report on the facts are affirmatively and clearly shown to be wrong, the court will accept same as correct. State ex rel. v. Tobacco Co., 177 Mo. 38; State ex rel. v. Standard Oil Co., 194 Mo. 164; Tufts v. Latshaw, 172 Mo. 371; Bank v. Donnell, 172 Mo. 402. (4) The National Packing Company was organized as a means and instrumentality through which to continue and perpetuate the various methods of combination which existed prior to its organization and through which methods the large packing interests of the United States were brought into an unlawful combine. This being true, various decisions of appellate courts herein cited, condemn respondents herein as being members of an unlawful pool. Sections 10298, 10299, 10300, 10301, 10304, 10322, R. S. 1909; Harding v. Glucose Co., 182 Ill. 551; Richardson v. Buhl, 77 Mich. 632; Distillery

& Cattle Feed Co. v. People, 156 Ill. 448; State v. Distilling Co., 29 Neb. 719; Lead Co. v. Store Co., 80 Mo. App. 266; Eustis v. Edgar, 207 Mo. 289; Finck v. Granite Co., 187 Mo. 244; United States v. Tobacco Co., 164 Fed. 700; Biscuit Co. v. Klotz, 44 Fed. 721; Strait v. Harrow Co., 18 N. Y. Supp. 224; Harrow Co. v. Hench, 76 Fed. 667; Harrow Co. v. Hench, 83 Fed. 36; Securities Co. v. Transit Co., 166 Fed. 945; Attorney-General v. A. Booth & Co., 143 Mich. 89; Capsule Co. v. Capsule Co., 67 Fed. 414; Wall Paper Co. v. Lewis Voight Sons & Co., 148 Fed. 939; Cotton Oil Co. v. Texas, 197 U. S. 129; Clancey v. Salt Mfg. Co., 62 Barb. 395; United States v. Pipe & Steel Co., 85 Fed. 279; Pittsburg Co. v. McMillin, 119 N. Y. 46; Noyes on Corporate Relations (2 Ed.), secs. 307, 310; Beach on Monopolies and Industrial Trusts, sec. 159, pp. 505, 507, pr. 167, p. 543, pr. 165, p. 536; 1 Eddy on Trusts and Monopolies, p. 550, prs. 617, 620, 621, 622; State ex rel. v. Standard Oil Co., 49 Oh. St. 137; People v. Refining Co., 54 Hun, 356; People v. Refining Co., 121 N. Y. 582; Bishop v. Preserves Co., 157 Ill. 284; Dunbar v. Tel. & Tel. Co., 224 Ill. 9; Securities Co. v. United States, 193 U. S. 197; United States v. Standard Oil Co., 173 Fed. 177; State ex rel. v. Standard Oil Co., 218 Mo. 1; 2 Cook on Corporations (6 Ed.), pr. 503a; State ex rel. v. Ins. Co., 152 Mo. 1; State ex rel. v. Packing Co., 173 Mo. 356; Froelich v. Benefit Assn., 93 Mo. App. 383; Brewing Co. v. Belinder, 97 Mo. App. 64; State v. Board of Trade, 107 Minn. 506; Railroad v. Closser, 126 Ind. 348; Coal Co. v. Coal Co., 68 Pa. St. 173; Joint Traffic Assn. v. U. S., 171 U. S. 338; Clark v. Railroad, 50 Fed. 346; Harvester Co. v. Commonwealth, 99 S. W. 637; Harvester Co. v. State, 99 Pac. 603; Cohen v. Envelope Co., 166 N. Y. 298; Hooker v. Vandewater, 4 Denio, 349; Stanton v. Allen, 5 Denio, 434; Railroad v. Railroad, 41 La. Ann. 970; U. S. v. Freight Assn., 166 U. S. 290; Standard Oil Co. v. Missouri, 224 U. S. 270; State ex rel. v. Harvester Co., 237 Mo. 369.    (5)

Independent of whether the National Packing Company was organized as a part and in pursuance of a former pool and combine, it was organized for the purpose, or, at least, provides a means through which the Armour Packing interests, the Swift Packing interests, the Morris Packing interests and the various subsidiary concerns, including the respondents, can and do lessen competition. Respondents are therefore guilty of the charges contained in the information. Cases cited under Point 4; United States v. Tobacco Co., 164 Fed. 700; United States v. Standard Oil Co., 173 Fed. 177; People v. Gas Trust Co., 130 Ill. 268; Securities Co. v. Transit Co., 165 Fed. 945; Wall Paper Co. v. Lewis Voight & Sons Co., 148 Fed. 939; Coal Co. v. Coal Co., 68 Pa. St. 173; Strait v. Harvester Co., 18 N. Y. Supp. 224; Biscuit Co. v. Klotz, 44 Fed. 721; Lead Co. v. Store Co., 80 Mo. App. 266; Richardson v. Buhl, 77 Mich. 632; Froelich v. Mutual Benefit Assn., 93 Mo. App. 383; State ex rel. v. Standard Oil Co., 49 Ohio St. 137. (6) Independent of the means which the National Packing Company affords, the Armour interest, the Morris interests, and the Swift interests meeting together with the representatives of respondents and jointly agreeing upon the affairs of these various interests, it is an unlawful combine, to which respondents are parties, in that it effectively destroys all competition and removes all incentive for competition among the various corporations, including the respondents, owned and controlled by the National Packing Company. Cases cited under Points 4 and 5, supra; State ex rel. v. Jockey Club, 200 Mo. 32; Terrett v. Taylor, 9 Cranch, 51; Commonwealth v. Bank, 28 Pa. St. 389; People v. Refining Co., 54 Hun, 354. (7) The various objections of unconstitutionality raised by respondents in their answer to these statutes are untenable, having all been foreclosed by prior decisions of this court and the United States Supreme Court. They are no longer open questions in this

State. State ex inf. v. Ins. Co., 150 Mo. 113; State ex inf. v. Ins. Co., 152 Mo. 1; State ex inf. v. Tobacco Co., 177 Mo. 1; Finck v. Granite Co., 187 Mo. 244; State ex inf. v. Oil Co., 218 Mo. 1; Standard Oil Co. v. Missouri, 224 U. S. 270.

*H. S. Priest, Morton Jourdan* and *Frank Hagerman* for respondents; *A. R. Urion, Henry Veeder, M. W. Borders* and *Ralph Crews* of counsel.

(A) The information is in nowise supported by the proofs. (1) Where, as here, *quo warranto* proceeds against a corporation for a violation of the anti-trust law, the information must charge the specific wrong-doing, and the proofs must show that which is thus specifically pleaded. State ex rel. v. Talbot, 123 Mo. 71; State ex rel. v. Grimm, 220 Mo. 490; State ex rel. v. Railroad, 240 Mo. 35; State ex rel. v. Railroad, 241 Mo. 11. If the evidence does not show the specific wrong-doing so alleged, there is not simply a variance but a complete failure of proof. Waldhier v. Railroad, 71 Mo. 514; Reed v. Bott, 100 Mo. 62; McManamee v. Railroad, 135 Mo. 440; Huston v. Tyler, 140 Mo. 263; Chitty v. Railroad, 148 Mo. 75; Richardson v. Busch, 198 Mo. 174. (2) If a material fact be pleaded as unknown to the pleader, there is a complete failure of proof if it appear that such fact was either known or could have been discovered by the exercise of reasonable diligence. State v. Stowe, 132 Mo. 208; State v. Thompson, 137 Mo. 623; State v. Moses, 139 Mo. 217; State v. Burke, 151 Mo. 145; State v. Nunley, 185 Mo. 109; Naftzger v. United States, 118 C. C. A., 200 Fed. 501. (3) The specific charge in the information was this: Respondents, not as passive instruments, but as active conspirators, with unknown parties, conspired to take over, own and control all the packing companies in Missouri and the United States, the names of which were unknown, and pursuant to the scheme the

National Company acquired the stock and assets of corporations whose names were likewise unknown. Both the proofs and the commissioner's report clearly showed: (a) There was never any purpose of obtaining control of all of such packing houses; (b) the alleged conspirators were Swift & Company, Armour & Company, Morris & Company and the companies actually acquired by the National Company, and (c) the names of these companies were actually disclosed at a preliminary hearing had under the statute (R. S. 1909, secs. 10332-10338) by the Attorney-General to see whether there was any reason for filing the information. Moreover, if such examination did not disclose the facts in every detail, they could have been ascertained by his asking for the production of the officers and directors and the books and papers of the companies doing business in Missouri. (B) The proofs were insufficient to make a case. (1) The commissioner's mere conclusion, in the teeth of findings to the contrary and his statement that there was no direct evidence to that effect, was that respondents were in a combination with Swift & Company, Armour & Company and the National Company. (2) Such a conclusion cannot be warranted by strong suspicions or probabilities, but can only be drawn upon a clear showing of (a) either a criminal intent to violate the law, or (b) a combination of such magnitude as to create a monopoly. State ex inf. v. Tobacco Co., 177 Mo. 37; United States v. Naval Stores Co., 172 Fed. 460; Bigelow v. Mining Co., 167 Fed. 709, 94 C. C. A. 13. (3) Here, both the findings and proofs clearly show there was no monopoly, while the facts do not warrant a finding of bad intent. (4) There not being a monopoly guilt cannot be found from the size of the business unaccompanied by improper acts or oppressive methods towards competitors. United States v. Naval Stores Co., 172 Fed. 458; Standard Oil Co. v. United

265Mo.9

States, 221 U. S. 1; Tobacco Co. v. United States, 221 U. S. 106; State ex inf. v. Harvester Co., 237 Mo. 394. (5) There was individual ownership of the stock of the National Company by G. F. Swift, J. O. Armour and Edward Morris, heads of Swift & Company, Armour & Company and Morris & Company. The National Company in turn owned the stock of respondents. From this alone the commissioner concluded not that there was any, but that there might be an abuse of the power flowing from such ownership, hence guilt. This was contrary to the law. State ex inf. v. Tobacco Co., 117 Mo. 37; State ex inf. v. Standard Oil Co., 194 Mo. 155, 218 Mo. 403; State ex inf. v. Railroad, 241 Mo. 1, 11; Bigelow v. Mining Co., 167 Fed. 721, 94 C. C. A. 13; U. S. v. Reading Co., 183 Fed. 427. (6) The proposed but abandoned consolidation of 1902 would have controlled not more than fifty-two per cent of the packing business. Its size alone, regardless of its abuse of its power, would not have made it illegal. United States v. Naval Stores Co., 172 Fed. 458; Standard Oil Co. v. United States, 221 U. S. 1; Tobacco Co. v. United States, 221 U. S. 106; State ex inf. v. Harvester Co., 237 Mo. 369, 394. The plan having been abandoned, it was not evidence of a combination thereafter. U. S. v. Reading Co., 183 Fed. 427. (7) The conclusions of the commissioner are not only contrary to the proofs, but they are inconsistent with the specific facts found. (8) The claim of violation of law is too stale to warrant a prosecution. A State, by lapse of time, wholly irrespective of any Statute of Limitation, loses its right to proceed in *quo warranto,* not only as against municipal (State ex rel. v. Westport, 116 Mo. 582; People ex rel. v. Alturas Co., 6 Idaho, 418; State v. School District, 85 Minn. 230; Cooley, Const. Lim. [5 Ed.] 311), but also private corporations. State v. Carr, 112 C. C. A. 477, 191 Fed. 266; Commonwealth v. Turnpike Co., 153 Pa. St. 47; State v. Water Co., 92 Wis. 496; State v. Railroad, 80 Neb. 333.

WALKER, J.—In June, 1910, the State of Missouri, upon the information of the Attorney-General, instituted a proceeding in *quo warranto* in the Supreme Court against the Hammond Packing Company, an Illinois corporation doing business under the authority of the laws of this State, at St. Joseph, Missouri, and the St. Louis Dressed Beef & Provision Company, a Missouri corporation engaged in business at the city of St. Louis.

On the same date a like proceeding was commenced in this court by the Attorney-General against the Armour Packing Company, a corporation organized under the laws of the State of New Jersey; Swift & Company, a corporation organized under the laws of the State of Illinois, and Morris & Company, a corporation organized under the laws of the State of Maine, each authorized to do business in this State.

The business of these corporations was the buying, slaughtering and marketing of live stock used for food, and in addition the dealing in cured meats, eggs, poultry, game, butter and other agricultural and dairy products, and the preparation and selling of the various by-products derived from the slaughtering of live stock.

The information in these cases was identical, barring names, dates and formal allegations particularly applicable to the corporations proceeded against, and each charged violations of the antitrust statutes of Missouri (Secs. 10298-10301, R. S. 1909).

Answers were filed in due time, and in January, 1911, an order was made referring the case against the Hammond Packing Company and the St. Louis Dressed Beef & Provision Company to the Hon. Daniel Dillon, as special commissioner, to hear and rule on the competency of all testimony offered, and return same into this court with his findings of facts thereon. An abstract of the voluminous testimony agreed upon by the Attorney-General and respondents' counsel was

used before the commissioner as the record in these cases, and is filed here as the "Joint Abstract of the Record," and will be referred to in the discussion of the issues submitted.

Although these proceedings were commenced separately, after the testimony had been taken before the commissioner in the suit against the Hammond Packing Company and the St. Louis Dressed Beef & Provision Company, counsel for these parties, as well as for the other corporations named, stipulated that the testimony thus taken, as well as the report of the commissioner, who was limited to a finding of facts, should be taken as the evidence in all of the cases, the stipulation being in these words: "It is hereby stipulated: That this case shall be submitted upon the evidence taken and the report of the commissioner made in case No. 16090, State ex rel. Attorney-General v. Hammond Packing Company et al., herein pending."

The informations are substantially as follows:

That respondents have entered into a pool, trust and combination among themselves and with other corporations and persons to relator unknown, with the purpose and design to (1) regulate, fix and control prices to be paid for beef and beef products, etc., for sale and sold in this State; (2) to maintain such prices when so regulated and fixed; (3) to regulate, fix and limit the amount and quantity of beef and beef products sold and offered for sale in this State; (4) to control and limit the trade in beef and beef products, etc., in this State; and (5) to limit and lessen competition in the purchase and sale of beef and beef products in this State. That by reason of said trust and combination formed as aforesaid respondents have (1) regulated, fixed and limited the amount and quantity of such products sold and offered for sale; (2) that they have fixed and maintained the price of such products bought and sold in this State; (3) that they have lessened lawful trade and full and free competition in

the purchase and sale of such products; (4) that they are now unlawfully and illegally fixing the price of said articles in this State; and (5) that they are restraining and limiting full and free competition in the purchase and sale of such products in this State. That there was in September, 1902, up to which time respondents were legitimate competitors of all others in the same business, formed under the laws of New Jersey the National Packing Company, herein called the "National Company," with power to do a packing business and own and control the stock of other corporations. That the National Company was not organized in good faith for the purpose of engaging in the business authorized by its charter, but as a corporate scheme and device to effect an unlawful arrangement between respondents and others engaged in business in Missouri and the United States, whose names were to the relator unknown, to lessen, restrict and destroy lawful trade and full and free competition, and to regulate, fix and maintain prices, and to control and limit the amount and quantity of things to be sold and offered for sale in Missouri and in the United States; that the scheme was to have the National Company as a holding corporation to acquire the stock and assets of all corporations and the plants of all individuals and partnerships, who, as competitors, did a packing business in Missouri and the United States, so that through the sole·control of the National Company it could pursue such policy as would remove all inducement for competition among such parties; that pursuant to the scheme thus concocted the National Company acquired, and has since owned and used, in aid of the said scheme, the stock of respondents, previously engaged in business in Missouri as legitimate competitors, and has since wrongfully operated them ostensibly as separate and competitive companies, whereby the public has been misled and deceived; that it acquired, and has ever since owned, the stock and assets of the cor-

porations, whose names were unknown to informant, engaged in the same business in Missouri, and the United States, and used the same to carry out the said scheme; that by this method and scheme, lawful trade and full and free competition was lessened, restricted and destroyed, and the quantity and amount of meat products to be offered for sale was controlled and limited.

The answer admitted the legality of the incorporation of respondents, their authority to do business in this State, and that as alleged in the informations they were at least until 1902 lawfully engaged in a competitive business with every other like concern in Missouri. Every other averment of the information was put in issue. The defenses presented by the answers were: (1) That the informations failed to state facts sufficient to constitute a cause of action; (2) That there was a misjoinder of parties defendant; (3) That the actions were barred by the Statute of Limitations; (4) That the statute creating the offenses charged had been repealed; (5) That the statute for the alleged violation of which forfeiture was sought was violative of the Federal Constitution; (6) That this court in an original proceeding has no jurisdiction to enforce the antitrust statutes. The commissioner being limited under the order of his appointment to a finding of the facts did not consider the above defenses, as they presented only questions of law.

Before the commencement of these proceedings the Attorney-General under the provision of sections 10332-10338, Revised Statutes 1909, caused an inquiry to be made to ascertain whether informations should be filed against respondents. This inquiry was had before the same commissioner who subsequently took the entire testimony but who was then acting under the appointment of this court solely for the purposes of the preliminary inquiry.

The testimony taken at this preliminary inquiry and which was thereafter introduced in evidence at the regular hearing before the commissioner, consisted of the articles of incorporation and licenses to do business in this State, of the Armour Packing Company, Armour & Company, Swift & Company, Morris & Company, Schwartzchild & Sulzberger, Cudahy Packing Company, Hammond Packing Company and St. Louis Dressed Beef & Provision Company; a statement showing the total number of cattle, hogs and sheep sold at the Kansas City stockyards in 1909, and the testimony of a number of witnesses interested in or connected in a business way with the respondents.

Much of the testimony taken before the commissioner in regard to matters antedating the formation of the National Company is irrelevant, and its consideration is not necessary to a determination of the issues involved. The record shows that whatever organization existed prior to the formation of the National Company was at its creation then terminated and the affairs of the preceding organizations closed up in July, 1902. To effectuate the organization of the National Company fifteen million dollars was borrowed by representatives of Swift & Company, Armour & Company and Morris & Company, the contract in regard thereto being signed by J. Ogden Armour, G. F. Swift and Edward Morris, heads of Armour & Company, Swift & Company and Morris & Company respectively. The agreement between these parties upon which was based the organization of the National Company provided that there should be formed a corporation with a bonded indebtedness and preferred and common stock, which should acquire the capital stock, plants, properties and business of Swift & Company, Armour & Company and Morris & Company, G. F. Swift, J. Ogden Armour and Edward Morris each agreeing that he would have conveyed to the new company at least eighty per cent of the capital stock of the

company of which he was the head.  It was provided that the tangible properties of the three companies should be appraised and payments in bonds and stocks made to each company therefor in such proportion as the value of the assets of each company bore to the value of the three.

Each party was to deposit one million dollars with a trust company to secure the performance of his part of the contract.

Any party thereto might purchase for the new corporation when formed, the capital stock and the properties and assets of other corporations engaged in the packing business upon the joint account of all of the parties, each of whom was to pay to the one making such purchase such proportion of all payments so made as the actual appraised value of the tangible property agreed to be conveyed by his company bore to the aggregate appraised valuation of all property of Armour & Company, Swift & Company and Morris & Company to be conveyed to the new corporation.

Pursuant to said contract purchases were made of the stock of the Omaha Packing Company, Hammond Packing Company, United Dressed Beef Company, Anglo-American Provision Company and its subsidiary companies, and the St. Louis Dressed Beef & Provision Company.  These purchases were made at a cost of ten millions of dollars.  J. O. Armour, G. F. Swift and Edward Morris borrowed eight million dollars to pay on account of these purchases, securing same by the properties purchased for the proposed consolidation, held by trustees and afterwards conveyed to the National Company.  The organized capital of the National Company was fifteen million dollars; the purpose of its organization as declared by its articles of association, was to engage generally in the packing business, but the evidence discloses that it has been operated only as a holding company and as a means of enabling Armour, Swift and Morris to meet to-

gether weekly and direct the corporations whose stock the National owned, as well as an instrumentality to enable the three packing companies, of which these parties were the heads, to form a substantial union of interests.

The directors of the National Company are all parties interested in or connected with the Armour, Swift and Morris interests. After the organization of the National Company weekly meetings were held by the representatives of Swift, Morris and Armour, in Chicago, and have been continued since the organization of the National Company. The National Company maintained an auditing department with general traveling auditors who were sent out to audit the books of the various subsidiary corporations. These auditors reported regularly to the general auditor of the National Company. It also maintained various forces to look after the respective departments of the packing business, and reports were daily and weekly made by each subsidiary concern to the National Company in relation to all the business transacted by them. Daily reports were made of the amount of purchases of live stock, the prices paid therefor, the prices paid by Armour, Swift and Morris, and the prices they have paid, and also the amount of stock to be on the market during the day.

The National Company had head buyers who went on the market to aid the local buyers of the subsidiary concerns. Information was given each of such concerns as to the amount of purchases to be made by it and the prices at which these purchases should be made; the said concerns made their purchases of finished products through the National Company; they transmitted their wants and orders to it and it placed such orders with whichever company it saw fit. The National Company each day advised them as to prices at which it could purchase for them, and in some in-

stances the subsidiary concerns were permitted to buy directly if it was found to their advantage.

A private wire connected all of the subsidiary corporations with the National Company, and daily information and reports relative to market conditions and the packing business were transmitted over this wire. The National Company charged no commissions on purchases made for the various corporations, but placed orders for each subsidiary corporation.

The profits and dividends declared by the National Company were derived from the dividends and profits of the subsidiary corporations, it having no other means of making profits. After the National Company received daily reports as to the purchases made and prices paid by each subsidiary corporation, this information was sent collectively to each of them to inform them what each of the other companies was purchasing and the prices being paid. The National Company also had a system of estimating costs which was substantially the same system adopted by Swift, Morris and Armour. This system and method was largely arbitrary and its basis was seldom changed. The selling price was determined by the estimated cost. The testimony is to the effect that the actual cost was usually less than the estimated cost, and that in St. Louis and at other points the price at which meat was sold by subsidiary concerns of the National and by Armour, Swift and Morris, was substantially the same.

At the weekly meetings of the National Company statistical statements as to all of the subsidiary con cerns of the National, as well as those of Armour, Swift and Morris, were submitted. These statements disclosed the number of cattle purchased by each subsidiary company of the National Company, as well as the Armour, Swift and Morris companies, the volume of shipments made by each subsidiary corporation to the various parts of the United States, and the prices at which packing products had been sold, together with the

working marginal price.    After such meetings, the president of the National Company, through its employees in charge of the various departments, communicated with the heads of the subsidiary corporations, advising them as to the amount of purchases to be made of live stock and the volume of shipments to be made to the various sections of the country.   These matters were decided and determined upon at the weekly meeting of the National Company.   Representatives of the subsidiary corporations of the National communicated with the representatives of Armour, Swift and Morris relative to market conditions, prices to be paid and prices at which packing products were sold. The affairs of the National Company and its subsidiary corporations were guided and managed by Swift, Armour and Morris.   The uniformity of prices at which live stock was purchased and packing products were sold by Armour, Swift and Morris, and the subsidiary corporations of the National Company, discloses the manner in which the affairs of the subsidiary corporations of the National were controlled and the course pursued by the Armour, Morris and Swift interests. These weekly meetings attended by Swift, Morris and Armour afforded the means and constituted the instrumentality by which these parties agreed upon the affairs and directed the business of each of said concerns.

Upon the facts as above set forth the special commissioner found substantially as follows:   That there was an agreement and understanding between Swift & Company, Armour & Company and Morris & Company and the National Packing Company and the respondents herein, and the other companies whose properties and assets had been transferred to the National Packing Company, as aforesaid, as to the conduct of their business made and entered into, with a view to lessen, restrict, limit and destroy free competition between said parties to said agreement in the purchase of cat-

tle, sheep and hogs, and in the sale of fresh meats and other packing house products in Missouri and in the United States, and that said agreement and understanding was made for the purpose of fixing and maintaining the prices of cattle, sheep and hogs and the prices of fresh meats and other packing house products in the State of Missouri and in the United States, and for the purpose of controlling and limiting the amount and quantity of fresh meats and other packing house products sold and offered for sale in the State of Missouri and in the United States. And that pursuant to said agreement and understanding Swift & Company, Armour & Company and Morris & Company and the National Packing Company, and respondents herein, and said other companies whose stock and properties had been conveyed to the National Packing Company as aforesaid, from the time said National Packing Company was incorporated until after the filing of the information in this case, did regulate and fix and maintain the prices of cattle, sheep and hogs and the prices of fresh meats and other packing house products in the State of Missouri and in the United States, and did control and limit the amount and quantity of fresh meats and other packing house products, sold and offered for sale in the State of Missouri and throughout the United States.

Formal written exceptions to the report of the commissioner were filed, and these cases are for hearing thereon; they will be considered in the order of their presentation by respondents.

I.  Respondents contend that the informations are insufficient in not specifically charging facts which show, if true, that respondents have violated the anti-trust statutes. Before comparing or contrasting authorities *pro* and *con* on this subject, it is well, as was said by Mr. Webster on a memorable occasion, that we "glance

**Sufficiency of Informations.**

at the sun and take our latitude'' lest in a general discussion of cases we are diverted from our true course and fail to readily reach the harbor of right conclusions.

Although the sufficiency of an information in a *quo warranto* proceeding of the particular class of these under review may generally be measured by the rules applicable to civil cases, as BROWN, J., has clearly said in State ex rel. v. Railroad, 240 Mo. 35, our sun, if we may be permitted to continue the figure, in these cases is primarily the statute, which modifies the general rule in antitrust proceedings. It is as follows: ''In any suit that is now pending, or which may hereafter be brought, in which it is charged that any per- son, corporation, partnership or association of persons has created, entered into, become a member of or participated in any pool, trust, agreement, combination, confederation or understanding in restraint of trade or competition with any other person, corporation, partnership or association of persons, it shall not be necessary to allege or plead the manner in which, or when or where such pool, trust, agreement, combination, confederation or understanding was made or effected.'' [Sec. 10310, R. S. 1909.] This statute, the terms of which are unambiguous, simplifies the information, in dispensing with the necessity of specific allegations in regard to the manner in which, the time when and the place where the pool or trust was effected, and is applicable not only to cases where the offenses charged to have been committed are wrong in themselves, but also to those in which a misuser of a lawful right is charged. As to the distinction to be made in the pleadings in these two classes of cases, see State ex rel. v. Railroad, 240 Mo. 35, and especially the concurring opinion of WOODSON, J., therein, l. c. 56, and State ex inf. v. Standard Oil Co., 218 Mo. l. c. 367.

An analysis of the information under review, the material allegations of which have heretofore been set

forth, will disclose, although we disregard the statute (Section 10310, supra) and determine the sufficiency of the pleadings by the rule applicable alike to either of the class of cases above referred to, viz., those charging acts wrong in themselves or those involving the unlawful exercise of a right, that they are not only sufficient in containing plain and concise statements of the causes of action (Sec. 1794, R. S. 1909) but in specifically alleging all the facts necessary to properly charge violations of the antitrust statutes. The matter of the sufficiency of informations in *quo warranto* proceedings of this character was elaborately and learnedly discussed by Faris, J., in State ex inf. v. Arkansas Lumber Co., 260 Mo. 212, in which it was held that although the pleadings viewed by the ordinary rules of procedure were vague, uncertain and indefinite, if, when measured by the terms of the antitrust statutes, they directly charged a violation of same in the language of these statutes, their sufficiency would not be questioned, especially when the fact appeared, as it did in that case, that no timely objections were interposed calling the court's attention to the defective pleadings or in any manner preserving such objections for consideration. In the cases at bar the demurrers to the informations, if they can be so considered, were incorporated into and made a part of the returns or answers; no rulings were demanded or made thereon and respondents are in the attitude of having answered over, which effects an abandonment of their demurrers. [State ex rel. v. Bright, 224 Mo. 514, 135 Am. St. 552.] If, therefore, the informations were not sufficient, measured by the rule applicable to this class of cases, and we disregard the literal terms of the statute (Section 10310, supra) which obviates special allegations, they may still be held sufficient under the carefully considered rule announced in the Lumber case, supra, especially in view of the fact that here as in that case no objections were made or preserved in such a

manner as to entitle them to consideration by this court.

In the analysis of these informations to determine their sufficiency we have not overlooked the fact that they contain allegations unnecessary to a proper and precise averment of the offenses complained of; to illustrate: following the allegation that respondents were guilty of entering into and consummating the unlawful combination "among themselves and with each other" it is averred that like offenses were committed by them with "other corporations, partnerships and individuals engaged in the same business (whose names are to informant unknown)." Of this more at length later. It may be said generally, without hypercriticism, that the informations are inartificially drawn and do not as they should, in unnecessary verbiage, point directly and clearly to the material matters in issue; nevertheless, although obscured with words, they are sufficient to charge the respondents with the creation and consummation of a monopoly, or, in other words, a conspiracy in restraint of trade. This being true, the statements of unnecessary matter above set forth may be treated as surplusage. It was so ruled by this court in State ex inf. Hadley v. Railroad, 206 Mo. l. c. 46, which held unnecessary allegations in *quo warranto* proceedings to be surplusage. In passing, it may be pertinently said that the Hadley case, supra, in its further ruling in regard to this class of pleadings, announced that they were not governed by the general rules of civil procedure, a doctrine since clearly repudiated in State ex rel. v. Grimm, 220 Mo. 483, as noted by Brown, J., in State ex rel. v. Railroad, 240 Mo. l. c. 48. This is relevant only so far as it goes to show that the general rules governing the procedure in civil cases are applicable in *quo warranto* cases, and as a consequence that it was unnecessary to specify in the informations the other corporations or individuals which by reason of the unlawful combination came un-

der the control of the National Company, because proof of such fact was not necessary to establish respondent's guilt.

The general rule in civil cases is that if a pleading sets forth sufficient facts to constitute a cause of action, plaintiff's right of redress is not prejudiced by the fact that unnecessary statements are added, but they may be disregarded. [Emmons v. Quade, 176 Mo. 22; Dunlap v. Kelly, 105 Mo. App. 1; Sumner v. Tuck, 10 Mo. App. 269; Van Raalte v. Epstein, 202 Mo. 173.]

In harmony with the rule announced in the Hadley case, supra, in regard to unnecessary allegations being regarded as surplusage, see also, Murray v. McGarigle, 69 Wis. 1. c. 491; Swift & Co. v. U. S., 196 U. S. 1. c. 395; State v. Thompson, 69 Conn. 720, and cases cited in 8 Cyc. 663, under note 9.

II. It is not necessary in these cases to enter into a discussion of the character and limitations of the power of the commissioner to take the testimony herein and report his findings thereon. This has been done in State ex inf. v. Standard Oil Co., 194 Mo. 1. c. 164, and the Lumber Company case, supra, and the correctness of the conclusions there reached is not questioned. We have, therefore, taken and considered the testimony in these cases as preserved in the joint abstract, as well as the commissioner's findings thereon, regarding the latter as persuasive and to be accepted as correct where same, which we did not find to be the case, was not affirmatively wrong. Without repeating the testimony at length, the relevant parts of which we have set forth in the statement with such succinctness as its prolixity will permit, it is disclosed that the National Company, organized as shown by its articles as a packing company, but utilized entirely as a holding company to direct, regulate and control other corporations, became after its organization the owner by purchase of the

*Sufficiency of the Evidence.*

stock of the respondents, the Hammond Packing Company, the St. Louis Dressed Beef & Provision Company and of eighty per cent of the Swift, Armour and Morris companies and of the stock of other packing companies not necessary to be further referred to here. The prime purpose of the organization of the National Company was to enable the heads of the great packing companies, to-wit, Swift, Armour and Morris, who were instrumental in its creation, to form a substantial and effective union of interests and thereby control, not only the supply of live stock furnished to packing houses, but its output as a dressed product, as well as its distribution and the prices to be paid for or received for same. In consummation of this scheme note the successive steps taken by the directory of the National Company not only to effectuate a union of interests but to completely control such interest when united: first, we find that the directors of the National Company were all interested in or directly connected with the Swift, Armour and Morris interests. When organized, the National Company, although its directory made no pretense of transacting any business authorized by its charter, held weekly meetings to direct and control the business of the various corporations whose stock it had acquired. At these meetings reports from all of the corporations whose stock was owned by the National were received in relation to all business transactions by them; these reports included daily reports of the amounts of live stock purchased, prices paid for same, prices made for live stock by the Swift, Armour and Morris Companies, and the amount of live stock to be on the market each day. Head buyers went on the markets at the various stockyards and aided the buyers of the various packing industries in purchasing stock for their respective companies. In addition, corrections were regularly given by the National Company to each of the other corporations as to the amount of

purchases to be made by them respectively and the prices authorized to be paid; they were required to make their purchases of dressed or finished products through the National Company if made on another company, and if such order was not satisfactory to the National it was authorized to place the order elsewhere. Each day the National advised the various other corporations as to prices to be paid by them for stock, and at times permitted them to buy directly if found to their advantage. A system of telegraphic intercommunication was in operation between the National and the other corporations, by which the former was enabled to know each day exactly what the other companies were doing in a business way. Much of the other testimony consists of a detailed account of the multiform methods adopted and pursued by the management of the National Company, in not only rendering itself at all times familiar with the business of each of the other corporations, but in practically controlling such business by regulating not only the amount of their purchases and the prices paid for stock, but in the sale of their finished product and the price at which it was to be sold.

A careful survey of the foregoing facts amply sustain the finding of the commissioner that the property and assets of respondents were transferred to the National Company to enable it to conduct, and that it did conduct, their business with their approval and co-operation, which they were powerless to prevent after a sale of a majority of their stock, so as to lessen, restrict, limit and destroy free competition between said companies in the purchase of live stock for food and in the distribution and sale of fresh meats and packing house products, and that said transfers and agreements were made for the purpose of fixing and maintaining the prices of live stock used for food and the prices of fresh meats and other packing house products, and for the purpose of controlling and limiting the quantity

of such meats and other packing house products in the markets sold or offered for sale in this State, and that said respondents, as disclosed by the testimony, from the time said National Company was incorporated and until after the filing of the information in these cases, did regulate, fix and maintain the prices of live stock for food and the prices of fresh meats and other packing house products and did control and limit the amount and quantity of fresh meats and other packing house products sold and offered for sale in this State.

This view of the fulness and force of the said testimony will, in the event of no prejudicial error being found in the proceedings, suffice to authorize an ouster under the statutes prohibiting unlawful combinations (Secs. 10298-10309, supra) and the general statute (Sec. 2635, R. S. 1909) authorizing judgments in cases of this character.

In reaching this conclusion we have not been unmindful of the rulings of this court (State ex rel. v. Asso. Press, 159 Mo. 410, 467; State ex inf. v. Cont. Tobac. Co., 177 Mo. 1, 37) that offenses such as are here charged, savor of crime and the judgments sought thereon should be rendered only upon clear and convincing proof. In the review of this evidence we have, therefore, considered the intent and purpose of the acts complained of, which if construed most liberally for the respondents, may not show an affirmative purpose to violate the law, but nevertheless the evidence is amply clear and convincing to show not only a specific intent to restrain legitimate competition in the articles and products involved and the consequent creation of a monopoly, but that by the creation of such a monopoly, trade was, in fact, unlawfully controlled and restrained. This conclusion is sustained by many authorities here and elsewhere construing the statute invoked as well as others of a similar character. [Nor. Secu. Co. v. U. S., 193 U. S. 197; State ex rel. v. Inter. Harv. Co., 237 Mo. l. c. 405; State ex inf. v. Armour

Pack. Co., 173 Mo. 356; State ex inf. v. Firemen's Fund
Ins. Co., 152 Mo. 1; People v. Sheldon, 139 N. Y. 251;
People v. North Riv. S. R. Co., 121 N. Y. 582; People
v. Gas. Tr. Co., 130 Ill. 268; Heim Brew. Co. v. Belin-
der, 97 Mo. App. 64.]

The force and effect of this testimony is not weak-
ened by the fact that on their face the articles of in-
corporation of the National Company, the instrumen-
tality through which respondents affected the unlaw-
ful combination and agreement, which prevented com-
petition and restrained trade bore evidence of the or-
ganization of said company for legal purposes, if, as we
hold it has been shown here, such organization grew
out of and was a part of an unlawful conspiracy be-
tween respondents to control the output, price and dis-
tribution of the articles and products in which they
dealt and thus practically render impossible all legiti-
mate competition (Finck v. Schneider Gr. Co., 187 Mo.
l. c. 268). The general rule in regard to combinations
of the character here under review as announced in
Swift & Co. v. United States, 196 U. S. 395, is not in-
appropriate in this connection; that although the sep-
arate elements of a scheme may be lawful if found to
be bound together by a common intent as parts of an
unlawful scheme to effect a monopoly, the plan may
make the parts unlawful. The liability of respondents
for violations of the statutes in question, if committed
in this State, as we hold them to have been, will not be
affected by the fact that the instrumentality through
which they operated in violating the law was a corpo-
ration which had been organized for ostensibly legiti-
mate purposes in another State. [Euston v. Edgar,
207 Mo. 287.]

From all the foregoing we find that the combina-
tion of respondents under the direction and manage-
ment of the National Company resulted in a common
management, a community of stock interests, an arbi-
trary fixing of the purchase and selling prices of live

stock for food and the dressed product thereof and a limiting at the will of the management of the quantity or amount of live stock to be bought or sold, all of which resulted in the lessening or destruction of competition in this State between respondents and the other corporations whose stock was acquired by the National Company.

III. The contention that these proceedings are barred by the Statute of Limitations might be entitled to serious consideration under the statute (Sec. 1914, R. S. 1909) which subjects actions brought by the State or for its benefit to a like bar to that applicable to actions between private parties; and as these proceedings are for penalties or forfeitures the three years' Statute of Limitations (Sec. 1890, R. S. 1909) would apply were it not for the fact that the pleadings allege that at the time they were filed, and the testimony shows that, not only at the time of the institution of these suits but thereafter respondents were members of and participated in the unlawful pool, trust and combination. The contention of the bar by limitations or from laches is, therefore, without merit.

**Statute of Limitations.**

IV. Respondents further contend that there is a misjoinder of parties defendant; that one corporation cannot be joined with others in a *quo warranto* proceeding for an abuse or misuse of corporate rights, because such a charge has relation to the individual contract of each of such corporations with the State, and that there is no such joinder of rights or interests as to authorize one proceeding against all. As has been heretofore shown, informations in *quo warranto* are governed by the rules of pleadings in civil cases. The respondents are charged not only with the same offenses, but such offenses are alleged to have been joined and to have

**Misjoinder of Parties.**

been committed in an abuse and misuse of their franchises growing out of the connection of their transactions with each other. Under this state of facts, if guilty, the State is entitled to only one satisfaction, if it may be so designated, to-wit: A forfeiture of the corporation's franchises, or in the case of foreign corporations, a revocation of their licenses and such penalties as may be adjudged in addition thereto. [Sec. 10304, R. S. 1909.] This being true, the joint proceedings of the State against the respondents, in the two actions, which might well have been brought as one, is in conformity with the Code of Civil Procedure (See Secs. 1734 and 1795, R. S. 1909) prescribing in the one instance who may be joined as defendants, and in the other what causes of action may be united in one petition. The invoking of the authorities of these civil procedure statutes to sustain a joinder in the cases under review, finds confirmation in State ex inf. v. Standard Oil Co., 218 Mo. l. c. 362, where the matter was ruled upon in conformity with the conclusion reached herein, and a number of Missouri cases cited in support thereof.

V. If the contention of respondents as to the repeal of the statutes under which these proceedings were brought was seriously made, it has

**Repeal of Statutes.**

been abandoned in their brief and arguments. It will suffice to say that these statutes were repealed and a new act was passed in relation to the entire subject-matter of pools, trusts and discriminations at the session of the Forty-seventh General Assembly (Laws 1913, pp. 549-555), but this act in no manner changed the burden of the offenses necessary to authorize the proceedings herein, but simply made additions to the acts declared in the former statute to be necessary to constitute an unlawful combination in restraint of trade. Respondents

are, therefore, in nowise materially affected by this legislation and their contention is lacking in merit.

VI.   A defense of former acquittal or prior adjudication of the matters here involved was urged by counsel for respondents in the oral argument, but was in no manner pleaded or otherwise preserved for review. Therefore, whether the rule in criminal or civil procedure be applied, this question is not here for our consideration.

**Former Adjudication.**

VII.   The contention that the antitrust statutes are violative of the Constitution of the United States, urged by respondents in their answer, but seemingly abandoned in their briefs, is so completely foreclosed against respondents' contention by the ruling of this court in State ex inf. v. Standard Oil Co., 218 Mo. 1. c. 376, which was affirmed by the Supreme Court of the United States (224 U. S. 1. c. 290), that time and space need not be taken in discussing this question. The validity of these statutes under the Constitution of this State has also been settled. [Finck v. Schneider Gr. Co., 187 Mo. 244, 271.]

**Constitutionality of Statutes.**

Finding no error in these proceedings, a judgment of forfeiture of the franchises of the St. Louis Dressed Beef & Provision Company should be entered, dissolving and ousting it from all corporate rights under the laws of this State, and in addition that a fine of twenty-five thousand dollars be imposed against it; and it appearing that the other respondents, to-wit: the Hammond Packing Company, the Armour Packing Company, the Morris Company and Swift & Company are foreign corporations authorized to do business in this State, it is ordered, for the violations of the law aforesaid in their abuse and misuse of the authority conferred on them, that their licenses to do business in

this State be revoked, and in addition that a fine of twenty-five thousand dollars be imposed against each of said corporations; and that each of said fines so imposed be paid into the State Treasury for the use and benefit of the State of Missouri, on or before the 15th day of June, 1915.

St. Louis Dressed Beef & Provision Company, ouster and a fine of twenty-five thousand dollars;

Hammond Packing Company, revocation of license and a fine of twenty-five thousand dollars;

Armour Packing Company, revocation of license and a fine of twenty-five thousand dollars;

Morris & Company, revocation of license and a fine of twenty-five thousand dollars;

Swift & Company, revocation of license and a fine of twenty-five thousand dollars.

Upon the payment of the fines severally assessed against each of said corporations, within the time above limited, the forfeiture of the franchises of the St. Louis Dressed Beef & Provision Company, and the revocation of the licenses to do business in this State of the other corporations herein named as respondents, will be stayed pending the further order of this court, upon the conditions hereafter to be set forth by this court in its order and judgment in regard hereto. All of which is so ordered.

*Woodson, C. J.,* and *Brown* and *Faris, JJ.,* concur, *Woodson, C. J.,* in separate opinion; *Faris, J., dubitante* as to what is said concerning section 10310, Revised Statutes 1909; *Graves, J.,* concurs in result of the opinion as to judgment of guilt as found in majority opinion, but thinks that under the peculiar facts in this case the fines are excessive and dissents as to the amount of the fines; *Bond, J.,* dissents in part and concurs in part in separate opinion; *Blair, J.,* having been of counsel, not sitting.

WOODSON, C. J. (concurring).—In my opinion
the Legislature has the power and au-

**Pleading and
Procedure in
Supreme Court
in Original
Proceedings.** thority to control all the pleadings and
procedure in this court the same as it has
in the circuit courts, and it is wholly im-
material whether it pertains to proceed-
ings in *quo warranto,* other original writs,
or any other matters intrusted to the keeping of this
court by the founders thereof.

The cases cited by Brother Bond on page 10 of his
dissenting opinion (p. 168, *post*) do not, in my opinion,
announce a contrary doctrine, and therefore, do not
support the proposition that the Legislature has no
such authority.

No such question was involved, considered or dis-
cussed in any of those cases, except by way of illus-
tration, and that was against my learned brother's
contention.

The question there decided was whether or not
the statutes mentioned in those cases applied to the
pleadings and practice in the Supreme Court, and not
that the Legislature had no authority to enact laws gov-
erning those matters, if in its wisdom it deemed it wise
to so do.

In the discussion of this subject, Judge NAPTON,
in the case of State ex rel. v. Stewart, 32 Mo. 379, l. c.
383, by way of *obiter,* expressly declares the law to be
contrary to the doctrine announced by my learned
associate, Judge BOND. The ruling of this court, as
announced in that case by Judge NAPTON is expressed
in the following language:

"There is no doubt that this court is mainly in-
tended by the Constitution as an appellate tribunal.
In some instances original jurisdiction has been given
to it, but chiefly with a view to enable it to exercise
more effectually its superintending control over infe-
rior courts. Its power in proceedings in *quo warranto*
seems to be a departure from the general policy

evinced in the construction of the court. Whether this jurisdiction was designed to extend to that class of informations which, under the English Statutes, had become essentially civil actions, commenced and conducted in the name of a public officer, but really for the mere ascertainment and settlement of private rights, is a question which might justify some hesitation and consideration, if it were necessary now to determine it. The Legislature, it is certain, has furnished this court with none of the machinery for trying issues in fact, and in practice such trials are altogether without precedent. These informations are attended with all the forms and must progress through all the stages incident to any other writ. There are pleas and demurrers, issues in law and in fact, trials by jury, motions for new trials in arrest of judgment, and writs of error. The issue of fact by the common law must be tried in the county where the franchise is situated. [Tancred, p. 3; Ang. & A. on Corp., p. 870, sec. 762.] If such a proceeding is entertained by this court, it must be conducted solely according to the forms of the common law, for neither the statute of W. & M. nor of Anne is in force here; *nor does our own statute apply to the Supreme Court,* but is exclusively confined to the circuit courts."

This language clearly recognizes the power of the Legislature to control the pleadings and practice of this court in proceedings of this character, should it deem it wise to do so.

The Stewart case just mentioned was cited with approval by this court in the case of State ex rel. v. Job, 205 Mo. 1, l. c. 25, where the court, in speaking through Fox, P. J., said:

"It is insisted by learned counsel for appellants that the relators were entitled to judgment of ouster by reason of the failure of respondents to answer on October 3, 1903, and it is urged that no sufficient answer or return was made to this proceeding until Jan-

uary 25, 1904. In support of this insistence our at-
tention is directed to State ex inf. v. Vallins, 140 Mo.
523. In response to this contention it is sufficient to
say that a complete answer to the contention is found
in State ex inf. v. Beechner, 160 Mo. 1. c. 86. That case
clearly marks the distinction between informations
in the nature of *quo warranto* at the relation of a pri-
vate person by leave, and proceedings by *quo warranto*
instituted by the Attorney-General by virtue of his
office. It was there expressly ruled that since 1855
there has been no difference in the rules applicable to
filing of amended returns and answers in proceedings
of this character in the circuit court, and the right to
amend an answer in any kind of a civil suit. In point-
ing out the distinction it was there said: 'The plain-
tiffs rely upon State *ex informatione* Crow, Attorney-
General, v. Vallins, 140 Mo. 523, and argue that it was
there held that no amendment in a *quo warranto* pro-
ceeding was allowable. But the case at bar is very
different from the Vallins case. This is a proceeding
in the nature of a *quo warranto* at the relation of a
private citizen, begun in the circuit court, whereas the
Vallins case was a proceeding by *quo warranto* insti-
tuted by the Attorney-General *ex officio* in this court.
This case could only be filed by leave of court, is con-
trolled by the *quo warranto* statute, and the statute re-
lating to the amendments in civil cases in a circuit
court. The Vallins case was filed by the Attorney-
General *ex officio* in this court, without leave, as he
had a right to do, was a proceeding by *quo warranto*,
which this court had a right under the Constitution to
issue, was controlled by the common law practice in
*ex officio* cases of *quo warranto*, was not affected by
the statute in relation to amendments, for as was shown
in the Stewart case (State ex rel. v. Stewart, 32 Mo.
379) that statute applies only to circuit courts and
not to this court, and therefore no amendment was
permissible in that case.' "

The other cases cited in the dissenting opinion, as previously stated, have no application to the proposition in hand.

From these observations it is clearly to be seen that the cases cited do not support the doctrine that the Legislature is powerless to control the pleadings and procedure in this court.

But upon principle, *the mere fact* that this court has authority to issue original writs, as I understand Judge BOND to contend, does not prohibit the Legislature from legislating upon and controlling those matters.

If that is true then by parity of reasoning the Legislature has no authority over the pleadings and practice in the circuit courts, in that or any other regard, for their authority is also derived from the Constitution, sections 1 and 23 of Article 6.

"Section 1.  The judicial power of the State, as to matters of law and equity except as in this Constitution otherwise provided, shall be vested in a Supreme Court, the St. Louis Court of Appeals, circuit courts, criminal courts, probate courts, county courts and municipal corporation courts."

"Section 23.  The circuit court shall exercise a superintending control over criminal courts, probate courts, county courts, municipal corporation courts, justices of the peace and all inferior tribunals in each county in their respective circuits."

As previously stated, the cases cited by Judge BOND simply hold that the statutes there cited only applied to the circuit courts and not to the Supreme Court.

Now, if the Constitution contains no inhibition against the authority of the Legislature to control the pleadings and practice in the circuit courts, then how can it be logically contended that it cannot control those matters in this court?

The authority of this and those courts to issue such writs is derived from the same authority—the Constitution—and the authority of the one is in no manner enlarged over or restricted as compared to the other; nor is the authority of the Legislature restricted in controlling the pleadings in the one any more than in the other.

If there is any difference in that regard, the authority of the circuit courts is broader because the authority conferred upon those courts to issue such writs is granted in general terms, while that of this court and the various courts of appeals is granted in specific or limited terms.

So, in my opinion, the cases cited by Judge Bond, instead of holding that the Legislature has no power to prescribe the rules of pleadings and practice in this court, are, upon the other hand, authorities to the contrary; and upon principle, as I have tried to point out, the Legislature does possess that power and authority, for the reason that this and those courts stand upon the same bottom and possess exactly the same power and authority in issuing writs of *quo warranto* and all other original writs.

It would be a most dangerous doctrine for this court to announce that the Legislature had no power to control the rules of pleading and practice herein.

While it is true, and it must be conceded, that the Legislature has no power to shear this court of its jurisdiction over the issuance and trial of such writs, yet there is nothing in the letter or spirit of the Constitution even remotely indicating that the Legislature may not, in its wisdom, control the pleading and procedure in this court in such matters.

With these observations in view I now return to the statutes in question. The most casual reading of them will show upon their faces that they apply to this court as well as to the circuit courts, and no sound reason can be advanced for holding they are not binding

upon this court as well as upon those courts. All are creatures of the Constitution, and derive their authority in that regard from the same instrument.

II. The doctrine in the Williams case, 221 Mo. 227, is not sound, and was not followed by this Court in Banc in the case of State ex inf. v. Arkansas Lumber Co., 260 Mo. 212. The information in that case is in all respects substantially the same as is the information in this case; and also in that of the case of State ex inf. v. Standard Oil Co., 218 Mo. 1, where the same ruling was had.

Information in Quo Warranto.

In both of those cases it was held that where the information or petition for the writ charged that the conspiracy was formed for an illegal or unlawful purpose, then the facts constituting the conspiracy need not be stated, but upon the other hand, that where the conspiracy was formed for doing a lawful act in an unlawful manner, then the petition should state the facts constituting the conspiracy. This is elementary and is recognized by all of the courts on both sides of the Atlantic.

In the consideration of this question, this Court in Banc, speaking through FARIS, J., in the case of State ex inf. v. Arkansas Lumber Co., 260 Mo. 212, l. c. 279, in clear and terse terms stated that rule in the following language:

"It is urged by learned counsel for respondents that the above case is decisive of their contentions upon this question in the instant case. Respondents, however, lose sight of the distinction which ought to be drawn under the law between the Missouri Pacific case, 240 Mo. 35, and the one at bar. In the Missouri Pacific case respondents were charged, in substance, with entering into an unlawful combination to do a lawful act; that is to say, an unlawful combination to fix a rate for carrying passengers not exceeding the statu-

tory rate which they were permitted by law to charge. Since by statute they might charge a maximum rate of three cents per mile for carrying a passenger, and since even pursuant to the alleged unlawful conspiracy into which it was charged they had entered, they were not seeking or conspiring to charge a rate beyond the maximum rate allowed by statute, they were endeavoring only *to do a lawful act by an unlawful means.* This distinction is clearly drawn in the Standard Oil case, supra, 218 Mo. l. c. 366.''

All pools, trusts and combinations mentioned in the statutes in question, in restraint of trade, etc., are unlawful, both at common law and under the statutes mentioned, and the rules of pleading prescribed in sections 10298 to 10301, Revised Statutes 1909, are in conformity with the common-law rule before stated, as has been held in this State in numerous cases.

III. Since reading the dissenting opinion, I have been convinced thereby that the penalties imposed by the majority opinion upon the respondents are excessive.

As I understand the policy of the State, it is not to unjustly or oppressively penalize the business interests of its citizens, but is to protect and encourage people to come into this State, establish and conduct legitimate business herein. Of course, that does not include business transacted in violation of the laws of the State of Missouri and good morals, whether transacted by citizens of this or any other State.

**Combination: Punishment.**

In the case at bar the record shows that prior to the filing the amended information in this case, the respondents voluntarily dissolved the National Packing Company and ceased to transact business through that medium, which was the heart of the unlawful conspiracy complained of in this case and the means through which that conspiracy was carried into execution. This shows that the respondents had in good

faith, prior to the filing of the amended informations in these cases, deserted the path of sin and thereby opened up the business avenues to the equal competition of all; and also enabled the consumer of this country to purchase the products of the packing house from the cheapest vendor.

Since these facts appear from the record, and that such institutions are absolutely necessary for the well being of the State and citizens thereof, I can see no valid reason for placing the heavy fines mentioned upon them; and so believing, I am in favor of reducing the fines imposed by the majority opinion to at least one-half of the sums stated therein.

Since the foregoing paragraph III was written, and before the majority opinion was concurred in, the fine in each case of fifty thousand dollars was reduced to twenty-five thousand dollars against each defendant, in accordance with my suggestion. I therefore concur in the majority opinion.

I.

BOND, J. (dissenting in part and concurring in part).—Being unable to agree to all the recitals of facts contained in the majority opinion or to its discussion of the law, I have prepared this statement of my views of both in this case.

The evidence shows that on May 31, 1902, a contract was made between Messrs. Armour, Swift and Morris for the formation of a New Jersey corporation, with a capital stock of ninety millions of dollars, to which should be conveyed the shares of stock of other corporations then owned or to be acquired by the parties. At the time of entering into this agreement the parties thereto owned or controlled large corporations bearing their respective names and engaged in the packing business. A forfeit of one million dollars was put up by each of them to secure the performance of this contract.

**Statement of Facts.**

Shortly thereafter Messrs. Sulzberger and Cudahy, who are also owners of or control large packing corporations, were admitted as parties to such contract on the terms therein specified. Thereupon certain New York bankers were requested to provide the money for the capital of the proposed corporation. After negotiations to that end these bankers, anticipating the panic of 1903, declined to finance the project, and Sulzberger and Cudahy withdrew from the contract and took down their deposits. In the meantime, the original contracting parties had purchased the stock and assets of certain other corporations engaged in the packing industry, including the Hammond Packing Company and the St. Louis Dressed Beef & Provision Company and borrowing for that purpose eight millions of dollars from a New York bank and expending two millions additional in the making of such purchase.

Upon the debacle of their scheme of mammoth consolidation the purchasers of these properties found themselves involved to the extent of their outlays and in possession of assets which could not be devoted to the purpose had in view when they were acquired. The matter was submitted to their counsel and it was determined to obtain a loan of fifteen millions of dollars by putting up the properties so purchased and other securities as collateral, and to organize a holding and operating company with a capital stock of fifteen millions of dollars, the shares of which should be issued to the co-owners of the properties so purchased, in proportion to their respective interests. This was done by the issuance of the stock of that company into the following proportions, to-wit: Sixty thousand, one hundred and sixty shares to J. O. Armour; seventy thousand and forty-seven shares to G. F. Swift; twenty thousand, seven hundred and eighty-three shares to Edward Morris, and one share each to qualify certain

directors. The company was duly organized under the corporate name of the National Packing Company under a charter issued in New Jersey in March, 1903.

Neither Armour, Swift nor Morris conveyed to the National Packing Company any of the stock or assets of the large corporations bearing their respective names and which they had contracted to put into the "big merger" which had collapsed. Neither the joint abstract nor the report of the commissioner sustains the recital in the majority opinion, that eighty per cent or any part of the assets of said corporations were conveyed to the National Packing Company. The capital stock and assets of the National Packing Company bore a very inconsiderable relation to the value of the outside properties owned or controlled by Messrs. Armour, Swift and Morris. The total meat and slaughtering business of the National Packing Company done in the year 1909 throughout the United States was seven per cent of the entire business of that kind done during that year. The total business done by the large corporations bearing the names of Armour, Swift and Morris for the same time was about twenty-nine per cent of the entire business carried on in the United States.

The commissioner appointed to take testimony in this case reported that the evidence did not show a monopoly of the meat and packing business if all of that which was done by the Armour, Swift and Morris concerns was added to that done by the National Packing Company.

The facts and the conclusions therefrom of the commissioner as to the formation of the National Packing Company are thus set out in his report:

"G. F. Swift, J. O. Armour and Edward Morris were, respectively, large owners of the stock of their respective companies, each standing at the head of the management of his company. These three men in the summer of 1902 formed a plan to consolidate the

large packing companies of the country and entered
into a written agreement setting out in detail the plan
of the proposed consolidation which embraced the for-
mation of a new corporation to which should be trans-
ferred the plants and properties of these three com-
panies, thereby showing that these three companies
had intended to consolidate themselves into a large
corporation even if no other company joined them.
They agreed to buy up other concerns with a view of
embracing them in the consolidation, and with that
end in view did actually buy the plants and properties
and capital stock of the respondents and of the various
other companies hereinbefore named. When, owing
to the financial panic, it was found impossible to make
the consolidation that had been contemplated, these
three men organized the National Company and con-
veyed to it the capital stock and properties of re-
spondents herein and of the other companies which
had been bought. These properties were transferred
to the National Company in full payment of its
$15,000,000 capital stock, and the whole of it was issued
to Swift, Armour and Morris in proportion to the in-
terests which each had held in the properties con-
veyed and turned over to the National Company. The
latter owned the capital stock and properties of re-
spondents and said other companies, its entire capital
stock was owned by the individuals, Swift, Armour and
Morris in certain proportions and large amounts. They
stood at the head of Swift & Company, Armour & Com-
pany and Morris & Company respectively. What fol-
lowed after that was what naturally would be expected:
Swift, Armour and Morris elected the entire board of
directors of the National Company, which was com-
posed of these three and others who are officers and
employees of the companies which they headed. That
board of directors, of course, controlled the National
Company, which established its general offices in Chi-
cago where those of the other three companies were

located. The directors of the National Company met every week at its offices. At that same time many of these directors were also members of the board of directors of Swift & Company, Armour & Company and Morris & Company. Those who were not such members were connected with and held responsible positions in these same three companies. Of course, there came before the directors of the National Company all important information as to how the company was conducting its business, what cattle it was purchasing, how its meats and other products were selling, and what prices they were obtaining. This board, of course, from week to week, gave directions as to how the business of the National Company should be conducted in view of conditions which existed from time to time. Reports were sent to the office of the National Company from all of its subsidiaries, and from its branch houses and consignees all over the country, by private wire and otherwise, and among those reports were received statements of the prices at which Swift & Company, Armour & Company and Morris & Company were selling their fresh meats in New York, Boston and other points. These statements were received by the agents of the National Company from the representatives of Swift & Company, Armour & Company and Morris & Company at the selling points, and transmitted by the agents of the National Company to its main offices in Chicago. This condition of things existed harmoniously from the time of the incorporation of the National Company in 1903 until after the filing of the information in this case. It is very hard to believe that the directors of the National Company would so conduct that company as to injure the business of either Swift & Company, Armour & Company or Morris & Company, and it is equally hard to believe that the directors of either of these last three companies would conduct its business so as to injure the business of the National Company. There is no

direct evidence that either Swift & Company, Armour & Company or Morris & Company had any agreement or understanding of any kind with the National Company as to the conduct and management of business. While some of the witnesses testified that they never knew of any arrangement, agreement or understanding of any kind between any of these companies, yet there is no hesitancy in finding that there was an unlawful agreement and understanding as to the conduct of business between Swift & Company, Armour & Company and Morris & Company and the National Company and the respondents herein and the other companies whose property and assets had been transferred to the National Company.''

In addition, the commissioner reported that the Hammond Packing Company and the St. Louis Dressed Beef & Provision Company, who are the only defendants in the *quo warranto* filed by the Attorney-General, No. 16090, were engaged in business in this State, the former as an Illinois corporation under a State license and through a plant established at St. Joseph, Missouri, the latter under a Missouri charter and through a plant established at St. Louis, and had been so engaged since 1891. The second information filed by the same officer at the same time (June 20, 1910) was directed against three foreign corporations bearing the names of ''Armour Packing Company,'' ''Swift & Company,'' and ''Morris & Company,'' and also licensed to do business in this State. That *quo warranto* is number 16089. As originally filed the information therein did not refer to the formation of the National Packing Company. The three defendants in the information were indicted and tried and acquitted in the Federal court at Chicago for an alleged violation of the Federal Antitrust Act. As to what took place at and after that trial the joint abstract shows, to-wit:

''W. E. Weber, called as a witness by the defendants, and being first duly sworn, testified as follows:

"I am, and have been for about seven years, general auditor of the National Packing Company, and as such general auditor have had general supervision and control of all branches of the accounting of the National Packing Company and its subsidiary companies.

"On July 17, 1912, the National Packing Company sold and transferred all packing house properties and branch houses owned or controlled by it, and delivered same on that day, for a cash consideration. At the same time, there was likewise sold all of the property of the various companies, the stock of which was held by the National Packing Company. The properties so sold were actually delivered to the purchasers on that date, and since then the National Packing Company has been in actual liquidation, and had done no business whatsoever, except business incident to such liquidation. These sales and these dispositions of its properties, as well as those of the companies the stock of which was owned by it, were made in good faith and for a valuable consideration. The property of the Hammond Packing Company, located at South St. Joseph, Missouri, was sold and delivered to the Armour interests, and the property of the St. Louis Dressed Beef & Provision Company, located at St. Louis, Missouri, was sold and delivered to the Swift interests. Since the sale and delivery of said properties to the Armour and Swift interests, respectively, the National Packing Company has had no interest whatsoever either directly or indirectly, in the operation of the business conducted on said properties, and the same has been owned, managed, controlled and directed solely by the Armour interests with respect to the Hammond Packing Company properties, and by the Swift interests with respect to the St. Louis Dressed Beef & Provision Company properties.

"I was a witness, and in constant attendance, at the trial in the case of the United States v. Swift et al., tried at Chicago, Illinois, in the United States District

Court, which resulted in an acquittal of defendants and a judgment thereon upon the 26th day of March, 1912. In that case there was charged a violation of the Sherman Antitrust Act in the formation and operation of the National Packing Company and its various alleged subsidiaries, the defendants being officers and directors of that company. Copies of the indictment, verdict and judgment in that case are herewith presented as exhibits.

"The testimony offered by the State here, is a portion of the transcript of the evidence in that case."

About one year after these events, to-wit, on November 6, 1913, the succeeding Attorney-General filed amended *quo warrantos* against the Armour, Swift and Morris Companies, charging them with complicity in the organization of the National Packing Company and making the same allegations with reference to the violations of the antitrust laws of this State, which are contained in the *quo warranto* filed against the Hammond and St. Louis Dressed Beef & Provision Companies.

When this information was filed the testimony had been fully taken by the commissioner, who made a preliminary examination before the proceedings were begun, and who had been reappointed after the filing of the *quo warranto*.

The two causes were submitted on the same joint abstract, after oral arguments by counsel for both parties, upon the evidence taken in No. 16090, and upon the pleadings and report of the commissioner and exceptions thereto filed by the respective respondents.

## II.

When the original informations were filed in this court the respective respondents therein made their returns or answers, in which, first, they challenged the

Information in Original Writs Issued by Supreme Court.

sufficiency of the information to charge any offense under the laws of this State; secondly, a general denial; thirdly, a plea of laches; fourthly, a plea that the statutes under which the proceedings purported to have been begun had been repealed.

Upon the presentations of these pleadings the court reappointed the former commissioner to report the facts only, but gave him no power to report or pass upon any question of law. The whole question in this case turns on two propositions: Did the information charge any offense under the antitrust laws of this State? Second, was there any evidence to sustain the report of the commissioner that such laws had been violated?

Taking these in order:

In issuing a *quo warranto* upon the information given to it by the Attorney-General *ex officio,* this court acts in virtue of its original jurisdiction conferred by the Constitution. The exercise of that jurisdiction cannot be controlled by the legislative body, nor can the pleadings in such actions be regulated by statute any further than this court permits or sees fit to adopt such regulation, as a reasonable rule for administering its jurisdiction as a court of the first instance. The Legislature cannot limit the original jurisdiction granted to this court, nor (what would be the same thing) limit the exercise of that jurisdiction. This has been repeatedly ruled in *quo warranto* when brought in this court by the Attorney-General *ex officio* as in the cases under submission. [State ex rel. v. Stewart, 32 Mo. 379; State ex inf. v. Beechner, 160 Mo. l. c. 86; State ex rel. v. Job, 205 Mo. l. c. 26; State ex rel. v. Vallins, 140 Mo. 523; State ex rel. v. Eby, 170 Mo. l. c. 527.]

It necessarily follows that the statute, Revised Statutes 1909, sec. 10310, quoted in the majority opin-

ion, which dispenses with any pleading of ''the manner in which,'' or when or where such pool, etc., was made or effected, if it applies in civil suits in the circuit court, as also the succeeding statute, Revised Statutes 1909, sec. 10312, dispensing with the same allegations in an indictment for a felony under the antitrust act, if either be valid or constitutional, are not decisive of the information under review, for under the settled law of this State neither of these statutes can control the pleadings in the two cases at bar.

The correct rule as to the allegations in *quo warranto* to forfeit a corporate charter is thus expressed: ''In other words, whenever the information in *quo warranto* avers that the respondent has a corporate existence, and the evident purpose of the proceeding is to have its charter forfeited for nonuser, misuser, or usurpation of powers, then the pleader must plead specifically the acts of nonuser, the acts of misuser, or of usurpation relied upon for grounds of forfeiture, so that the corporation may know what it is called upon to meet and defend.'' [State ex rel. v. Grimm, 220 Mo. l. c. 494.]

The above rule was to establish the necessary averments in a proceeding for *quo warranto* brought in the circuit court. It was approved in express terms in a recent case in Banc where it was also ruled that an information filed here by the Attorney-General, charging respondents with making an agreement to ''lessen and destroy competition'' in the carriage of passengers and freight and to ''fix and regulate rates'' without specifying what rates had been agreed upon, or the time fixed for their continuance, was insufficient to state a misuse, abuse or perversion of the corporate powers of respondent. The court added: ''The allegation by the Attorney-General that the agreement or combination entered into by respondents is an illegal usurpation and an abuse and perversion of corporate power, is merely a conclusion or presumption of law on

the part of the pleader, and not being predicated upon facts set forth in the information, does not supply the lack of such definite facts as should have been specifically pleaded.'' [Schiffman v. Schmidt, 154 Mo. 204; Mallinckrodt Chemical Works v. Nemnich, 169 Mo. 388; Gibson v. Railroad, 225 Mo. 478; Lackawanna Coal & Iron Co. v. Long, 231 Mo. 605.] It was accordingly ruled that the demurrers to the information in question must be sustained and the cause was dismissed. [State ex rel. v. Railroad, 240 Mo. l. c. 49 and 50.]

The conclusion above stated is clearly correct, and it is peculiarly pertinent in this case, in view of the fact that the court quoted in its opinion in that case the statute (section 10310, supra) so strongly relied upon in the majority opinion, its attention not being called to the fact that the information in the case was one *ex officio* on the part of the Attorney-General in this court, and hence the statute in question was inapplicable.

Under the authority of these two cases in Banc the rule must be considered as settled in this State that an information of the character of the present states no cause of action if it alleges in effect merely a violation of sections 10298 to 10301 inclusive of the present revision without *definitely* and *specifically* stating the facts and circumstances showing guilt under those sections. Such general allegations when made in a pleading, contain no more of the elements of an offense under the antitrust statutes, than would be embodied in a general accusation of violating that statute. In other words, allegations of the information which simply quoted the statutory terms forbidding agreements to lessen competition, fix, regulate and maintain prices or to regulate quantity and amount of output, had no legal efficacy whatever in stating any cause of action against the respondents charged with violating such section, or at least no greater potency in stating a cause of action than if the pleader had named the respondents

and merely added that they were violating the statutes in question—setting them out in his pleading. It follows therefore that the objections to such of the causes of action as were attempted to be stated in the informations by *general averments* that the respondents had violated the provisions of the antitrust statutes, must be sustained. These attacks upon the information are explicitly set forth in the returns in proceedings falling within the original jurisdiction of this court. Having power in such cases to prescribe the forms of pleading and judge of the sufficiency of the pleadings, and not having delegated that function to its commissioner, it is the duty of this court to render its judgment in the matter. In so doing, it is fully supported by the recent decision of FARIS, J., in State ex rel. v. Arkansas Lumber Co., 260 Mo. l. c. 277, where an imperfect pleading, not a totally defective one, was sustained against an *ore tenus* objection argued after the finding of the commissioner, who in that case, unlike the present, was empowered to pass upon questions of law. In the case at bar, the objection was made *in limine* in the return of respondents; besides the omission of a pleading to state any cause of action whatever may be objected to without any formal pleading and at any time. As to the causes of action stated in the present information by averring in general terms that respondents violated the several antitrust acts, there was a total failure to state any legal cause of action against them. In such cases, the rule is essentially different from that applicable to a pleading which makes an imperfect statement of a cause of action. The latter can only be reached by a seasonable and suitable objection. The former is always open for review with or without a formal pleading.

### III.

After eliminating from the present informations the causes of action based solely on the *defective* alle-

gations contained therein, there still remains for con-

**Information: Sufficient Specifications.** sideration so much of the information as may allege any other cause of complaint. The portion of the information relied up-
on for that purpose states in substance that respond-
ents, the Hammond Packing Company and the St. Louis
Dressed Beef Company, organized the National Pack-
ing Company as a trust instrumentality and by means
of the practices of that corporation in Missouri and in
the United States conducted a non-competitive and
pooling business through a unified corporate manage-
ment and user of their assets and corporate powers in
aid of the unlawful purpose for which said holding
company was created. That previous to the organiza-
tion of the National Packing Company its subse-
quently purchased corporations had been "legitimate
competitors" in the cattle and meat business in Mis-
souri and in the United States; that to carry out its un-
lawful purpose said corporation voted the stock, col-
lected the dividends, and made use of the assets of the
respondents and other "individuals and partnerships
whose names are to informant unknown . . . with
a view to lessen, restrict and destroy lawful trade and
full and free competition . . . in products dealt in
by respondents, and to regulate, fix and manage the
prices thereof and to limit the quantity sold in Mis-
souri and the United States . . . and have fixed
and regulated such prices and are now from time to
time unlawfully so doing," with a prayer for the for-
feiture of the charter and license of respondents and
the imposition of a fine.

The antitrust acts of Missouri were first enacted in
1889. Shortly thereafter a practical counterpart of
them was enacted by the National Congress and known
as the Sherman Act. Congress has not amended its
first enactment. The Legislature of Missouri has am-
plified and broadened its antitrust law by successive
amendments (1891, 1895, 1901, 1907), but without al-

tering their essential character and nature in any material respect.   One of the earliest cases in this State arose in the St. Louis Court of Appeals in a suit brought by the National Lead Company to collect a bill for sales of its goods made in this State, the defense being that the plaintiff in that case, a holding corporation, was engaged in a violation of the antitrust laws of this State then in force, and therefore amenable to the statute depriving it of the power to collect the price agreed to be paid for its products.   The evidence in that case conclusively showed that the plaintiff corporation was created to take over the assets and property in the hands of certain trustees of an unlawful combine with a capitalization of ninety million dollars and engage in the actual violation throughout the United States and in Missouri of the provisions of the Sherman Act and the laws of this State prohibiting agreements, pools, trusts, combines and conspiracies in restraint of trade.   The only defense by the plaintiff in that action to these charges was the *fact* of its *corporate entity.*   The first question determined in that case was that the original trust agreement under which the predecessor of the plaintiff was organized, disclosed by its terms and the methods and practices of the parties thereto that it was entered into and carried on "to suppress competition, fix the price of commodities and limit their production and restrain trade."   After making this finding the court added: "But the illegality of the organization and operation of the National Lead Trust, does not involve the conclusion that the purchaser of its assets, whether a natural or artificial person, succeeded also to the status of that illegal combination under the laws enacted in this State for the punishment of pools, trusts and conspiracies.   For the mere purchase by one of the assets which another has employed for an illegal purpose, does not of itself imply that they will be used by the purchaser for the purpose of effectuating the objects

to which they had been devoted by the seller. Such an intent on the part of the purchaser, if inferable, must be gathered from proof of all the circumstances characterizing the transaction, as well as his subsequent conduct."

The court then found that the original Lead Trust, after assuming its corporate form, engaged in the *same* business in this State and elsewhere which it had carried on before that metamorphosis took place. Hence there was nothing in such change which could exempt its transaction in this State from the application thereto of our antitrust laws, and added: "Hence it must follow that if the stockholders and governing officers of the plaintiff corporation combined with each other to violate any of the provisions of the section under review through the instrumentality of their corporate entity, then the corporation composed by them was a party to such illegal combination within both the letter and the spirit of the above section of the Act of 1891. Or concretely stated, that a combination which is illegal under the antitrust law, cannot be operated under the cloak of a corporation by its constituent members of governing bodies." Citing authorities. [National Lead Co. v. Grote Paint Co., 80 Mo. App. l. c. 267, 270.]

The doctrine of that case has been affirmed in this State in the exhaustive opinion in the Standard Oil case, 218 Mo. l. c. 452, and elsewhere. [To the same effect Standard Oil Co. v. United States, 221 U. S. l. c. 75, paragraphs A and B; United States v. Am. Tobacco Co., 221 U. S. l. c. 176.]

While it is true the corporation known as the National Packing Company was not *preceded* by an illegal combination of the corporations whose property it took over, for the informations explicitly stated that prior to the formation of the National Packing Company all the corporations, including respondents, whose assets and stock it acquired, were legitimate competi-

tors, and that fact distinguishes it from the facts in judgment in the case of the National Lead Company v. Grote Paint Co., supra, yet the allegations of the information do in effect charge that the National Packing Company was contrived and incorporated for the specific purpose of enabling the two respondents and other unknown persons and corporations to enter into a trust or combine in violation of the laws of this State, and they go further and allege that the subsequent operation of the National Packing Company in this State and elsewhere was in contravention of such statutes. Under these allegations, showing the unlawful practices of that corporation, to all of which the two respondents were charged to be participants, a case was stated against them under the decisions cited. For if these allegations were shown to be true by the evidence adduced by the commissioner, then a prima-facie case was made. I therefore think that the information did state a cause of action against respond-' ents, based on the allegations of the unlawful purpose and practices of the National Packing Company.

### IV.

As to the sufficiency of the evidence to make a prima-facie case against the two respondents, I also think the proof, though not positive nor direct, affords a basis clearly justifying the deductions of the commissioner that there was no competition Sufficiency of Evidence. in this State between the two respondents whose plants were respectively located at St. Louis and St. Joseph, nor between them and any of the agencies representing the three corporations mentioned in the second information, since the three persons who controlled these also owned the National Packing Company. But the evidence wholly fails to show any specific instances of the fixing or regulating of the prices of cattle products, meats and other commodities dealt in by the respond-

ents in the two informations. And it shows beyond question as found by the commissioner, that there was no actual monopoly obtained by the instrumentality of the National Packing Company, for its business bore a wholly insignificant relation to the mass of slaughtering business done at Kansas City. Neither is there any substantial evidence that the beef, hog and cattle business in this State was limited as to its quantity or the sale of its products by the operations of the National Packing Company, nor is there any evidence in the record that the prices of any of the commodities dealt in by the five respondents to the two informations were enhanced beyond the standard fixed by a fair market, on account of the existence of the National Packing Company and the business done by it in this State, or that the consumer or producer of such products or outside dealers have been injured by the operations of the National Packing Company. The most that can be said of the testimony contained in the joint· abstract is that it discloses the basis of a legitimate inference that the five defendants did not compete with one another, and that this happened solely from the existence of the holding corporation owned by Messrs. Armour, Swift and Morris. The unification of a relatively small proportion of their interests in that form, the properties they bought for the abandoned project, and the control thereby exercised over business of the two other defendants, the Hammond Company and the Dressed Beef Company, precluded the possibility of independent competition on the part of the two latter companies in the commodities dealt in by them. I am convinced that the necessary consequence, acts and deeds of the defendants in organizing the National Packing Company and in conducting through it for their joint interest a non-competitive business in this State was to contravene the first of the following sections of the statute in force at the time these informations were filed. Those sections are to-wit:

"Sec. 10298. *Combination in Restraint of Trade Declared a Conspiracy.* Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or competition in the importation, transportation, manufacture, purchase or sale of any product or commodity in this State; or any article or thing bought or sold whatsoever, shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and shall be punished as provided in this article. [R. S. 1899, sec. 8965, amended Laws 1907, p. 377.]

"Sec. 10299. *Pool and Trust Agreements Defined.* Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any other person or persons to regulate, control or fix the price of any article of manufacture, mechanism, merchandise, commodity, convenience or repair, or any product of mining, or any article or thing whatsoever, of any class or kind bought and sold, or the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, or to maintain said price when so regulated or fixed, or shall enter into, become a member of or participate in any pool, trust, agreement, contract, combination, confederation or understanding, to fix or limit the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever of any class or kind bought and sold, or the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, shall be deemed and adjudged guilty of a conspiracy in restraint of trade, shall be punished as provided for in this article. [Laws 1907, p. 377.]"

265Mo.12

It has become the settled policy of the country that trade shall be competitive. Whether that is the true ideal of society as a philosophic principle need not be discussed, since all judicial inquiry has been foreclosed by the national and state antitrust laws. To enforce these is the simple duty of the court, and it is no answer to this to say that a particular combination created in contravention of the statute should be exempt from its penalties because its business operations have not been injurious to the consumer of its products. The statute was designed to forbid the making of a combination having the potentiality to injure the public, and denounces such as conspiracies in restraint of trade. Even at common law, an unlawful conspiracy was indictable without proof of any overt act. The statute has embodied that idea in the first section quoted above and the offense thereunder was technically complete when the National Packing Company was put into operation under an agreement of its creators that it should conduct the business of certain corporations owned by them and turned over to it without competition.

These statutes must be given a reasonable interpretation. This method of construing such statutes was established in a great judgment recently delivered, when the Supreme Court of the United States held that similar Federal statutes must be interpreted by the *exercise* of reason. That decision, when made, met a downpour of rant and was assailed by blasts of flatulent criticism, but, being founded on the *rock of reason*, it withstood both the rain and wind of verbosity, and emerged from the storm, in the serene light of correct thinking, as an enduring canon of legal science.

The judgment of the Chief Justice of the United States in these cases has been quoted and adopted by the Supreme Court of Missouri in the recent case in Banc. [State ex inf. v. International Harvester Co., 237 Mo. l. c. 392.]

In the nature of things there could be no competition between the two subsidiary corporations (respondents in the first information) for their capital stock was owned by the National Packing Company and they were operated by its direction and through its representatives, and this undisputed fact warranted the commissioner in finding that these two respondents under the mask of a holding company were violating the antitrust act (R. S. 1909, sec. 10298) which forbade agreements to lessen competition. But neither this fact nor any other evidence in the record tended to show that the two respondents were *not competing* with other corporations not owned or controlled by the National Packing Company. Nor that absence of competition between the two respondents had affected in any degree the market prices of meat and its products in this State, or regulated its standard, or diminished the output of such products in this State.

Neither was there any evidence in the record that a producer or consumer or a competitive dealer, was injured by the unification of ownership created in the formation of the National Packing Company. The bare fact that a single ownership was in contravention of the letter of a section of the antitrust laws, is all that can be deduced from the evidence in this case. These facts in my opinion are determinative of the proper judgment to be rendered herein.

In considering that question, attention must be given to the further fact that this holding company was voluntarily dissolved and its property sold to purchasers for cash *before* the second information was filed and about two years before the submission of the case. It is therefore apparent that the law will be fully vindicated and the antitrust act wholesomely administered by ordering ouster of the charter of the one and revocation of the licenses of the others. Such orders to be suspended upon a showing by respondents that their present business operations are not con-

ducted by non-competitive methods, and will not be so carried on hereafter. Such ouster and revocation to be enforced in the absence of such showing or whenever it may be made to appear in the future that the respondents have violated the antitrust laws of this State, and to enforce such penalty jurisdiction should be retained.

This in substance has been our method of dealing with other cases when the respondents, though acting theretofore in violation of the law, have *after* judgment made such amends. Here the law has been seemingly complied with before judgment and after an acquittal of the officers of the corporation under an indictment for forming such corporation.

When the respondents dissolved the National Packing Company in advance of the decision of this case, they gave up the only thing upon whose existence any infraction of the laws of this State was predicable in the averments of the information. Necessarily therefore when the National Packing Company ceased, the non-competitive methods of respondents under that agency also ceased.

The informations admit that prior to the National Packing Company *all* of the respondents were "legitimate competitors." Seemingly, therefore, that status has been now regained. At least, there is nothing in this record that shows to the contrary. This record is a transcript of the one made on the trial of the three individuals who incorporated the National Packing Company for violation of the Federal antitrust law. They were acquitted in that proceeding.

The national and State idea on this subject is to foster the growth and expansion of business by normal and fair methods and through honest instrumentalities. It was not designed to check the development of industrialism in any of its forms or departments. Its only object is to prevent by the national and State law on this subject injury to the producer, or to the con-

sumer, or a destruction of the rights of independent dealers. It is not the purpose of these acts in any way to limit or control the combinations of capital which are essential to the conduct of enterprises beyond the ability of single projectors. Those ends in my opinion will be completely achieved by the judgment heretofore indicated. For that reason, I dissent to the aggregate fine suggested in the majority opinion of a quarter of a million dollars, believing that the record affords no just basis for such a punishment or for any moneyed judgment beyond a taxation of costs against all the defendants except the Morris Company, of Maine, which had no existence at the date of the conspiracy alleged; hence the proceeding should be dismissed as to it.